[No. 3251.]

### William Humphries *v.* The State.

1. Theft — Alibi — Burden of Proof — Charge of the Court. — In a trial for theft one of the defenses was *alibi*, and on the issue raised thereby the trial court charged the jury as follows: "If the jury believe that the *alibi* which has been set up as a defense in this case has been proven, or if they have a reasonable doubt as to the fact of whether said *alibi* has been proven, they will give the defendant the benefit of it, and acquit him. When an *alibi* is relied upon as a defense, it rests on the defendant to prove it to the extent of raising a reasonable doubt as to whether the accused is the person who committed the offense charged." *Held* error. In no criminal trial is the burden of proof shifted from the State on to the defendant. Proof of *alibi* is not an affirmative proposition by the defendant, but is an attack upon the inculpatory evidence of the State. It may be such as affirmatively disproves the case made by the State, or it may only suffice to legitimately raise a reasonable doubt of the guilt of the accused; and in either case he is entitled to an acquittal.
2. Same.— As defined by the trial court an *alibi* is: "When an offense has been proven to have been committed upon a certain date and at a certain place, and the evidence shows that at that time the accused was at some other place than that where the testimony shows the offense to have been committed,— so remote from it as that it would have been impossible for him to have been the person who committed the offense," etc. *Held* erroneous because it renders nugatory all proof of an *alibi* of the defendant unless the State has previously proved the commission of the offense at the time and place involved in the contestation. See the opinion *in extenso* on the subject.

Appeal from the District Court of Kendall. Tried below before the Hon. T. M. Paschal.

The conviction in this case was for the theft of a horse, the property of A. H. Boales, in Kendall county, Texas, on the 28th day of October, 1882. A term of five years in the State penitentiary was the penalty imposed by the verdict.

A. H. Boales was the first witness for the State. He testified that in October, 1882, he lived in Bandera county, Texas, but now lives in Edwards county. Witness had known the defendant for several years. On October 23, 1882, witness turned his horse loose in the range on the west fork of the Medina river, and did not see him again until some time in the following February, when he found the animal in the possession of Louis Hopf, in Kendall county. Witness never sold this horse or authorized anybody to take him away. Witness went before a justice of the peace, and by a witness proved the animal to be his, and took it away. The horse was a bay gelding, branded with a half circle J D on the left hip or

thigh, and the figure 4 on the jaw; the latter a blotched brand. Witness never, at any time, saw the defendant in possession of this animal. The defendant, who lived, at the time of the theft, some four or five miles from the witness in Bandera county, had seen the witness riding this horse, but witness could not say that the defendant knew or did not know the horse.

On the day that the witness last turned his horse out before missing him, he was, with his nephew, running some horses that belonged to one Rhymes, in an effort to capture one of his horses running with Rhymes's. Witness and this nephew, Willis Mayfield by name, met the defendant that day and had a talk with him about getting up a horse race. Witness was then riding the animal which was subsequently stolen. The defendant ridiculed and laughed at the idea of the witness's horse running a race, because of his then poor condition. Witness could not be certain as to the date on which he last turned that horse out before he was stolen, but it was not later than the 23th, nor earlier than the 26th of October, 1882. He turned the horse on the mountain at a little place called "Monier Orchard," which was seven or eight miles west, or perhaps a little north of west, from where the defendant then lived. Witness then lived near and east of Monier Orchard, and about twenty-five miles west from the town of Bandera. Comfort in Kendall county was in the opposite direction from Bandera than that in which the witness then lived,—that is, Comfort was east from Bandera. Witness would say that the distance from Bandera to Comfort was about twenty-five or thirty miles, and that the distance from his place, where he turned out his horse, to Comfort was about fifty miles, east.

It was through a Mr. Kidd that the witness learned that the defendant was the man who took his horse. Kidd told witness that he learned that fact at Medina City, a place west of where the witness lived. Witness did not know how Kidd obtained his information. Kidd was not present on this trial. Witness knew but one man near Comfort, and his name was Sparks. He knew a man named Brown, but did not know whether or not Brown took his horse. Witness went to Kendall county to recover his horse, where he heard that Mr. Hopf had him. He did not travel the road all the way to Kendall county, but traveled through the bushes part of the way. *En route* he met the man Sparks, spoken of, and others, and Sparks told him that defendant had his horse. Sparks then went with the witness to a justice of the peace, before whom witness, on information and belief, made a complaint against the defend-

ant, and Sparks was deputized to arrest him. Sparks stayed with the witness three or four days, looking for the defendant. They went from Comfort to Boerne, in Kendall county, a distance of about twenty miles, and from Boerne they went to Mr. Hopf's house, and witness proved and recovered his horse. Sparks, who now lives in Nueces county, went into Bandera county in search of the defendant. Sparks did not tell the witness that he was then evading arrest for killing a man in Wilson county, and that the defendant was a witness against him. If Sparks had any other motive in hunting for defendant, or desiring his arrest, than to enforce the warrant, witness did not know it. If Sparks was ever at witness's house, witness did not remember it, but would not swear that he never was.

Witness saw Mr. Bodeman at Comfort, but did not ask him to go with him to get his horse, though he knew Bodeman to be an officer. Sparks introduced Bodeman to the witness. Witness had no recollection of the men Ayres and Watson, but could not say that such men were not in his neighborhood in 1882. Witness had lived in San Patricio county, and there knew a man named Watson, who is now dead. Witness had also lived in Live Oak county. When witness met Sparks, on his way to Comfort, he was not traveling a regular road. Before going into the town of Comfort, witness went with Sparks to his house and got dinner. Sparks was the person by whom witness proved his horse on finding him at Hopf's. Witness never agreed with one Ayres and one Watson that they should take his horses and sell them, and afterwards he, witness, would follow, prove and recover them as his property.

Louis Hopf was the next witness for the State. He testified that at a point on the San Antonio road, about a mile below Boerne in Kendall county, and in the direction from that town opposite Comfort, he traded horses with the defendant, who said that his name was Will Brown. The horse traded to the witness by defendant was proved away from witness by Boales and Sparks. This trade was made in the latter part of October, 1882, about two weeks before district court convened in Boerne. Witness had started to San Antonio, and was overtaken on the road by the defendant at about 8 o'clock in the morning. After riding along the road a distance of perhaps a hundred steps, they stopped and traded. Witness had never seen the defendant before, and did not see him again until a year afterwards, when he went to the Bandera county jail to identify him. Witness readily identified him among the four prisoners then in the Bandera jail. Buck Hamilton, sheriff of Bandera county,

spoke to him, saying: "Will Humphries, get up and walk around."
Defendant obeyed without hesitation, not appearing to recognize
the witness. He was much paler than when witness met him on
the road a year before, and was dressed differently. Witness was
then in Bandera county under attachment as a witness against de-
fendant. He had been told that the name of the man who traded
him the horse was not Brown but Humphries. Sparks and Boales
had described Humphries to witness.

When the witness met the defendant and traded horses with him
in the road near Boerne he, defendant, wore a suit of dark cloth and
a dark colored hat. He did not notice that defendant then had an
overcoat, baggage or weapon. He noticed no bruise or scar about
the defendant's face, nor blood about his person or clothing. Wit-
ness could not now describe the other prisoners he saw in the Ban-
dera jail, except that they were all white, and apparently well
dressed. When the witness and defendant traded horses, the latter
said that he had just come from Fort Concho, where he had been
shearing sheep. His horse, the one for which witness traded, ap-
peared to be much fatigued. The road on which they met led from
Fort Concho to San Antonio. Witness did not take or ask a bill of
sale, but gave his horse and $1.50 in boot for the horse defendant
was then riding. Witness and defendant were together, when this
trade was made, not over twenty-five or thirty minutes. The de-
fendant had not recently shaved when witness met him at the time
of the trade. He had a moustache, such as he now wears, but more
beard, and he wore a moustache and more beard than now when he
was in the Bandera jail. Witness did not know the man Sparks.
When Boales came to witness's house and claimed the horse, witness
described the man from whom he got the animal as a young man,
above medium height, a little more spare in build than the witness,
with dark complexion, hair and eyes, and Boales said: That is "Bill
Humphries." The horse for which witness traded with defendant
was branded with a half circle J D on the left hip, and a blotched
brand on the jaw that witness could not make out.

Albert Bodeman was the next witness for the State. He testified
that he saw Humphries, the defendant, in possession of a bay horse,
in Comfort, Kendall county, Texas, on the 31st day of October,
1882. Witness knew it was on October 31, 1882, because he went
to a sængerfest at Boerne, on the next day after he saw the defend-
ant and the horse, and that sængerfest was held on November 1,
1882. Defendant was then at Faltin's saloon, where he got into a
difficulty, and witness knocked him down, and made him leave Com-

fort.  He was then dressed in a suit of gray clothes, and wore a
gray hat.  He had no arms or baggage on his horse that the witness
saw.  The difficulty spoken of was between the defendant and a
man named Sparks.  He told witness that his name was Bill Frees.
The row occurred about night, and witness escorted defendant as
far as the Guadalupe river, and made him leave that vicinity.  The
whole of the evening of the row, the defendant spent in a public
place, and the horse was hitched immediately on the public road.
The witness struck him quite a severe blow on the nose, causing it
to bleed freely, and knocking him down.  The blow sobered the
defendant very fast, and he mounted his horse very quickly after-
wards.  The horse he was riding was a bay animal, about fourteen
and a half hands high, branded half circle J D, on the left hip, and
a blotched brand on the jaw.  Witness distinctly remembered the
horse because, knowing the defendant was offering him for sale, he
went out and looked at him.  Many persons, now residents of
Comfort, were present on the occasion referred to.  Witness was
then the constable of the Comfort precinct.

In October, 1882, when witness saw the defendant in Comfort, as
stated, the man Sparks referred to lived near Comfort, but across
the line in Kerr county.  He now lives, the witness has been in-
formed, in Kimble county.  Sparks told the witness that the defend-
ant's name was not Frees, but Bill Humphries.  Witness afterwards
heard, in Comfort, that the defendant stole Boales's horse.  Witness
was taken to Bandera county at the November term, 1883, of the
district court of that county, under process, as a witness for the
State, in the case of the State against defendant for the theft of
this horse.  Witness had never seen the defendant prior to meeting
him in Comfort on October 31, 1882, as stated, and did not see him
again until he saw him in the Bandera county jail.  District Attor-
ney Wallace, Buck Hamilton, the deputy sheriff, Mr. Street and Mr.
Louis Hopf went to the jail with witness.  Witness had been told
that the man whom witness saw at Comfort, the man who traded
the horse to Hopf, and the man who was in the Bandera jail, were
one and the same man, and that he was Bill Humphries, and the
witness went to the jail expecting to see the same man that he pre-
viously saw in Comfort.  On seeing him, witness remarked to Hopf:
"He has changed awfully; he is much whiter than he was."

John Reinhard next testified, for the State, that Boales and
Sparks came to Boerne some time in November, 1882, during the
term of the district court.  They had a warrant for the arrest of
the defendant, issued by a justice of the peace of Kendall county.
Witness was busy at the time.  The State closed.

Mrs. Georgie Humphries, the wife of the defendant, was the first witness introduced in his behalf. She testified that she knew the whereabouts of the defendant from October 26, 1882, until the 4th or 5th of November following. She was able to fix the dates exactly by means of occurrences which took place between the dates mentioned. She remembered distinctly that district court met in Bandera on Monday, October 29, 1882, and the defendant's father took the witness's brother, Willis Rhymes, to court, in a wagon, the said Willis being a juror. Witness knew A. H. Boales, but did not see him during the time between October 26 and November 4 or 5, 1882. She heard, however, that the said Boales was hiding out from the grand jury that was organized when district court convened on October 29. The defendant was at home on October 26, 1882. On the following day, Saturday, October 27, witness went to the house of the defendant's father, and was there on the next day, October 28. Defendant came to his father's house where the witness was, and did not leave there until late Monday evening. He was then with the witness at home until afternoon on Tuesday evening, and witness saw him every day for several days thereafter at home. She positively knew that the defendant remained at home every day while the witness's brother was in attendance upon the Bandera district court, and he did not return until the latter part of the week, which was either on the 4th or 5th day of November. The witness could not say how the defendant was employed during the brief periods he was out of her sight, during the interval between October 26 and November 4 or 5, but she did know that at no time between those dates was he absent from her long enough to have gone to Comfort. Witness and her husband, in October and November, 1882, lived about twenty miles west from the town of Bandera.

June Coorpender was the next witness for the defense. He testified that the defendant came to his store at Medina City, fourteen miles west of Bandera, after dinner, on Sunday, October 28, 1882, and bought a plug of tobacco. The witness's books still disclose that fact. Witness's store was some four or five miles distant from defendant's house. Defendant, when he left the store, went in the direction of his father's house. Witness did not know where he went to after that, and did not see him for some time. Witness left on next day, Monday, to attend court at San Marcos. Witness was never at Comfort, and did not know how far that town was from Medina City. Witness was not related to the defendant.

Mrs. Mary E. Moody testified, for the defense, that she had known

the defendant about six years. She saw him on October 26, 1882, and on the 28th of the same month she loaned him a bay mare,— his brother Newt coming to witness's house after the animal. At that time, and now, the witness lived about eighteen miles west from the town of Bandera. The witness remembered that this was the 28th day of the month because court, which her father left home to attend on the next morning, convened on the 29th. Witness was unable to say how long it was before she next saw the defendant.

O. N. Humphries, a brother of the defendant, testified in his behalf that on Sunday, October 28, 1882, he borrowed a horse from Mrs. Moody for the defendant to ride to Medina City where June Coorpender and Tom Shepard kept stores. Witness went with defendant towards Coorpender's store as far as John Rankin's place. On that evening the defendant came to witness's father's house, and did not leave until the evening of the next day, October 29, 1882. He and his wife then returned home. Witness did not see the defendant again for several days.

Mrs. Mary J. Humphries, the mother of the defendant, testified in his behalf that the defendant came to her house on the evening of October 28th, and remained there until the evening of the next day. Witness could fix the date exactly because she knew that her husband took Willis Rhymes to Bandera on the first day of court, which was the 29th, the day after defendant arrived at the house. Knowing that defendant was at home when court commenced, the witness and others proceeded to ascertain the day of the month on which court convened, as soon as they heard that defendant was accused of this offense. Defendant rode Mrs. Moody's bay horse to witness's house on October 28th, and rode it away on the 29th. Witness saw defendant again at his home, some seven or eight miles from witness's house, about the last of the week.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Hurt, Judge. This conviction is for the theft of a horse, the property of A. H. Boales. The evidence in the case is such as to present two defenses:

1. That the witnesses for the State may have been mistaken in the identity of the defendant as the person who traded the horse to

Louis Hopf, and who was seen in the possession of the horse.    This evidence is of such a character as to present this issue, considered independently of the testimony which tends to prove an *alibi*.

2. An *alibi*.    There is strong testimony in the record in support of this defense, and the learned judge below, in view of this fact, submitted to the jury the following instructions upon this phase of the case: ".  .  .  3. If the jury believe the *alibi* which has been set up as a defense in this case has been proven, or if they have a reasonable doubt as to the fact of whether said *alibi* has been proven, they will give the defendant the benefit of it and acquit him.    When an *alibi* is relied upon as a defense, it rests on the defendant to prove it to the extent of raising a reasonable doubt as to whether the accused is the person who committed the offense charged."

To this charge the defendant objected, and saved his exceptions by bill.    If there is no proof of an *alibi* adduced upon the trial, the case stands upon the other evidence, whether introduced by the State or the defendant.    If there be evidence tending to prove an *alibi*, the case is to be tried upon all of the evidence,— that for the State as well as that for the defendant.    But in no case is the burden upon the defendant.    Proof tending to establish an *alibi* is an attack upon the evidence which tends to prove guilt.    An *alibi* is not an affirmative proposition, made by the defendant, with the burden of proof resting upon him, but evidence in its support, depending upon its cogency, disproves, weakens or questions that which tends to prove guilt.    Such evidence is a direct attack upon guilt, and, if of sufficient strength and cogency, may affirmatively disprove guilt.    But if its effect is such, whether introduced by the State or the defendant, as to create a reasonable doubt as to the guilt of the defendant, it should prevail and work an acquittal. ( *Walker* v. *The State*, 42 Texas, 360.)

If the State, by competent evidence, has established the guilt of the defendant beyond a reasonable doubt, and there is no evidence of *alibi*, certainly he should be convicted, and, if believed by the jury, a conviction would follow; and the case being closed without such evidence, *alibi* would not be in the case.    And in such case, if there be such evidence at the command of the defendant, it would be admissible for him to introduce it.    Under such a state of case, in one sense the burden would be upon the defendant to make such proof.    With this, however, the trial judge has nothing to do, because, there being no such proof, *alibi* would not be in the case, and hence the court should refrain from charging upon matters not authorized by the record.

We cannot agree with the learned judge in his definition of *alibi*. He defines *alibi* thus: " An *alibi* is when an offense has been proven to have been committed upon a certain date, and at a certain place, and the evidence shows that at that time the accused was at some other place than that where the testimony shows the offense to have been committed, so remote from it as that it would have been impossible for him to have been the person who committed the offense; and hence if the jury have a reasonable doubt as to whether the defendant was the person who was testified to have been seen in Comfort with the alleged stolen horse, or who was testified to as having traded the horse to Hopf, you will acquit."

Mr. Bouvier defines an *alibi* as follows: "Presence in another place than that described." . . . "When a person charged with a crime proves that he was, at the time alleged, in a different place from that in which it was committed, he is said to prove an *alibi;* the effect of which is to lay a foundation for the necessary inference that he could not have committed it."

In that part of the charge of the court defining *alibi*, the jury are told that, to constitute an *alibi*, the offense must first have been proven to have been committed upon a certain date and at a certain place. .This charge proceeds upon the idea that the State has proved that the offense was committed at a certain time and place, and that when this is done, and not before, evidence that the defendant was at some other place is for the purpose of proving an *alibi*.

Now, let us suppose that the State has not proved that the offense was committed by the defendant at any time or place, and yet the defendant adduces evidence tending to show that he was not at the place of the offense at that time, but was elsewhere. Under the definition of *alibi* given by the learned judge, this would be a very dangerous blunder; for the jury would most certainly infer from the charge that the State had proved its case, and, unless they should believe the evidence tending to prove the *alibi*, they would very likely convict, notwithstanding the evidence of the State, when considered separate and distinct from that which tends to prove the *alibi*, may not be sufficient to convict.

We will not discuss the questions raised upon the motion for new trial, based upon the action of the court in overruling the application for a continuance. This question will be eliminated upon another trial. For the error in the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered May 27, 1885.]